UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DELIVERMED HOLDINGS, LLC, WILLIAM R.
DEETER ASSOCIATES, INC., and LINDA DEETER,

        Plaintiffs,

        v.

MICHAEL L SCHALTENBRAND, JOEY D.
SIDDLE and MEDICATE PHARMACY, INC.,

        Defendants.

Case No. 10-cv-684-JPG-DGW

consolidated with

MARK A SWIFT,

        Plaintiff,

        v.

MICHAEL L SCHALTENBRAND, JOEY D.
SIDDLE and MEDICATE PHARMACY, INC.,

        Defendants.

Case No 10-cv-685-JPG-DGW

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

It was the best of times, it was the worst of times, it was the age of wisdom, it was the age of foolishness, it was the epoch of belief, it was the epoch of incredulity, it was the season of Light, it was the season of Darkness, it was the spring of hope, it was the winter of despair, we had everything before us, we had nothing before us. . . .

Charles Dickens, *A Tale of Two Cities* (1859).

This is a tale not of two cities, but of two vastly different views of a business venture

that, at its inception, had the potential to be extremely profitable but which, during its

management – or mismanagement, as the case may be – went horribly awry.  Because there is no

written agreement between the principal characters in this tale, the stories told vary greatly with

no grounding in authoritative documents.  There is disagreement as to who the real partners in

this business venture were and even whether a partnership existed at all.  What makes this case

particularly puzzling is that the major players in this lawsuit are educated, sophisticated,

experienced, savvy business people who, for reasons unknown to this Court, entered into this

lucrative (this characterization is also disputed) business venture without a written agreement of

any kind.

Now for the nuts and bolts.  This case began as two separate cases:  *DeliverMed*

*Holdings, LLC v. Medicate Pharmacy, Inc.*, No. 10 C 1874 ("DeliverMed Action"), and *Swift v.*

*Medicate Pharmacy, Inc.*, No. 10 C 689 ("Swift Action"), both filed in the District Court for the

Northern District of Illinois.  The cases were consolidated and then transferred to the District

Court for the Southern District of Illinois as Nos. 10-cv-684-JPG-DGW and 10-cv-685-JPG-

DGW, respectively.

I.      **Claims in the Case**

In the fourth amended complaint (Doc. 285), plaintiffs Linda Deeter, William H. Deeter

Associates ("Deeter Associates") and DeliverMed Holdings LLC ("DeliverMed") plead five

causes of action in the DeliverMed Action:

> Count I:  a claim by plaintiffs Linda Deeter, Deeter Associates and DeliverMed for
> copyright infringement based on the "house and pestle" logo;
>
> Count II:  a claim by DeliverMed under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),
> for trademark and service mark infringement based on the "DeliverMed" name, the
> "Right at Home" tagline, and the "house and pestle" logo;
>
> Count III: a claim by DeliverMed under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),
> for unfair competition based on use of the aforementioned name, tagline and logo;
>
> Count IV:  a claim by DeliverMed under the Illinois Uniform Deceptive Trade Practices
> Act ("UDTPA"), 815 ILCS 510/2, based on use of the aforementioned name, tagline and
> logo; and

2

Count V:  a claim by DeliverMed under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, based on use of the aforementioned name, tagline and logo.

In the fourth amended complaint, plaintiff Mark A. Swift pleads seven causes of action in the Swift Action:

Count VI:  a claim for common law fraud;

Count VII:  a claim for breach of contract regarding wages, commissions and distributions;

Count VIII:  a claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

Count IX:  a claim under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*;

Count X:  a claim for breach of contract regarding a stock transfer;

Count XI:  a claim for promissory estoppel; and

Count XII:  a claim for a declaratory judgment directing Medicate Pharmacy Inc. ("Medicate") to issue Swift correct Form 1099s for tax years 2007, 2008 and 2009.

In the Counterclaims, Michael L Schaltenbrand, Joey D. Siddle and Medicate plead three counterclaims in the DeliverMed Action (Doc. 169):

Counterclaim 1:  a claim for a declaratory judgment that DeliverMed's claim to a copyright in the "house and pestle" logo is invalid and unenforceable;

Counterclaim 2:  a claim to cancel the trademark registration on the "house and pestle" logo; and

Counterclaim 3:  a claim to cancel the trademark registration on the "DeliverMed" name.

The defendants also plead one counterclaim in the Swift Action (Doc. 127):

Counterclaim 4:  a claim for common law fraud.

3

II.     **Trial**

The Court held a fourteen-day trial of the consolidated cases in Benton, Illinois, on April 23 to May 4, 2012 and May 14 to 17, 2012.  The record was left open, and additional evidence was tendered, but the Court declines to consider that evidence in the absence of an adequate testimonial foundation and authentication.  The plaintiffs were represented by A. Courtney Cox, Russell K. Scott, James Arthur McGurk and Diane R. Poshard.  The defendants were represented by Kevin J. Stine, Mark S. Shuver, Laura E. Craft-Schrick and Ned W. Randle.  The plaintiffs called as witnesses in their case in chief Schaltenbrand, Larry Schaltenbrand Jr. ("Larry Jr."), Siddle, Allan Kovin, Deeter, Craig Greene, Swift and Ann Sickon.  The defendants called as witnesses in its case in chief Ken Bodenhagan, Kevin "Kip" Adkins, Schaltenbrand, Siddle, Larry Jr., Larry Schaltenbrand Sr. ("Larry Sr."), Cara Hoffman and Michael Wenzel.  The plaintiffs also called Swift as a rebuttal witness.

During the course of this bench trial, several hundred documents were introduced into evidence, some of which contradicted witnesses' testimony, appeared to have been altered after produced in discovery or were admitted by their authors to be incomplete or inaccurate financial statements.  In addition, experts who relied on some of those documents testified that their opinions were only as accurate as the documents they reviewed.  Throw all that in on top of vastly conflicting testimony from the principals themselves, and it will be no surprise that the decision in this case comes down to the Court's assessment of whether the party asserting the action has met its burden of proof by preponderance of the evidence.  For the reasons set forth below, the plaintiffs have failed to meet their burden of proof on all but two counts, and the defendants have failed to meet their burden of proof on two of their counterclaims.

Credibility decisions are key to the Court's determination.  The trier of fact has the

responsibility to judge whether the testimony of the witnesses is truthful and accurate in part, in whole or not at all.  Although the Court had questions regarding the memory and credibility of all of the principals, the Court had more credibility issues with Swift than it did Schaltenbrand and Siddle.  The Court notes that Swift's testimony frequently contradicted other more credible evidence in the case and, on occasion, his own testimony.  A few examples demonstrate these contradictions:

- Swift's testimony at trial about the date and extent of his ownership interest in DeliverMed differs from information Cara Hoffman, an accountant with DeliverMed's accounting firm Blackman Kallick and an uninterested witness, testified credibly that he gave her in connection with preparing tax returns.

- Swift testified at trial that he sold his interest in certain household goods to his wife Ann Sickon, but she testified she did not give him any money for those assets.

- Swift testified that handwriting on the DeliverMed Holdings, LLC Operating Agreement contained in DeliverMed's corporate book was placed on the document years before it was produced in discovery, but the copy produced in discovery contained no such handwriting.

- Swift testified that he hand-delivered a loan guarantee to the Bank of O'Fallon and followed up with a telephone call to bank Vice President and Cashier Kip Adkins, but Adkins, an uninterested witness, testified credibly that the guarantee was not in the bank files and that he never talked to Swift about a guarantee.

- As explained in more detail below, Swift misrepresented on an official application for trademark registration the date the "house and pestle" logo was first used.  He claims that the misrepresentations were mistakes he made because he is not a lawyer, but his excuse

is patently incredible in light of the fact that he is an educated and experienced

businessman who was fully engaged in the process leading to the development of the

logo including the year the logo came into existence and was first used in commerce.

- Swift testified that he did not intend to "crash" Schaltenbrand's business after their

relationship soured, but documentary evidence (UCC-1 filings by DeliverMed and emails

from Swift to Atkins falsely referencing Medicate's bankruptcy) is clear evidence to the

contrary.

These representative examples of the unreasonableness of Swift's testimony in light of the other

evidence in the case cause the Court to seriously question his credibility in all areas of his

testimony.  In addition, the Court notes that Swift's demeanor while testifying frequently

suggested fabrication and even, on occasion, self-delusion.

In addition, based on her demeanor while testifying and on inconsistencies with other

documentary evidence, some of Sickon's testimony was not credible.  Specifically, her affidavit

prepared shortly after this action began contained multiple false statements, which she admitted

at trial were false.  Additionally, she displayed a lack of knowledge about the money matters and

records involved in this case that belies her testimony that she frequently reviewed financial

documents and consulted with Swift about them.  These and other instances indicate either an

honest lack of knowledge regarding essential facts of this case, a deliberate indifference to the

truth, or a lack of diligence in ascertaining the truth.  The Court has therefore not credited some

of her testimony.

In light of this weighing of Swift's and Sickon's credibility and pursuant to Federal Rule

of Civil Procedure 52, the Court makes the following findings of fact and conclusions of law:

### III.   Findings of Fact

The Parties

1.   Swift is a well-educated, savvy businessman.  He has undergraduate degrees in
accounting and finance and a master's degree from the University of Chicago in business
administration with an emphasis in economics.  He is a former certified public
accountant.  He has worked for a major health insurance company, a major worldwide
consulting group and a global medical device and pharmaceutical corporation, has done
consulting work in the healthcare industry, and has been involved in setting up mail order
pharmacy businesses.

2.   Schaltenbrand is the president and sole shareholder of Medicate.  Medicate is a retail
pharmacy with locations in Washington Park and East St. Louis, Illinois.  Schaltenbrand
also owned other companies with "Medicate" in the name that were not retail pharmacies
but were in the health care field.

3.   Siddle is an employee of Medicate who knew Swift from a prior business relationship.

4.   In 2001 or 2002, Swift and his wife Ann Sickon purchased the right to the internet
address "delivermed.com."

5.   In March 2004, Swift and Sickon attempted to form DeliverMed as an Illinois limited
liability company to market mail order pharmacy services to potential customers.  The
formation document was entitled "DeliverMed Holdings LLC Operating Agreement,"
and Sickon was listed as the 100% owner of DeliverMed.  Swift served in an unofficial
capacity as an unpaid advisor to Sickon and DeliverMed but had no ownership interest at
the time.  Nevertheless, he held himself out as a majority owner of DeliverMed and
exercised control over DeliverMed and authority to enter into agreements for

7

DeliverMed.  DeliverMed's articles of organization were not signed or filed with the Illinois Secretary of State until January 2005.  At its inception, DeliverMed worked with several pharmacies (e.g., Family Health Plans, Express Meds) to solicit mail order customers.

6.     In 2003 or 2004, Swift and Sickon, on behalf of DeliverMed, attempted to register the name "DeliverMed" with the United States Patent and Trademark Office ("USPTO").  In the application for service mark registration submitted on behalf of DeliverMed, Swift indicated that the name "DeliverMed" was first used on February 1, 2005, to identify retail pharmacy services provided by DeliverMed.  Swift knew at the time that DeliverMed had never used the name "DeliverMed" in commerce to identify retail pharmacy services or any other goods or services.  However, he anticipated at the time forming a partnership with a pharmacy to provide pharmacy services to customers DeliverMed identified and recruited.  Specifically, DeliverMed needed to partner with a pharmacy in order to secure a contract with the State of Illinois to provide mail order pharmacy services to Medicaid patients.

7.     On February 3, 2009, DeliverMed obtained a service mark registration in the USPTO supplemental register for the name "DeliverMed" for retail pharmacy services (Reg. No. 3,570,921).  The registration certificate indicates the mark was first used on February 1, 2005.  The mark was actually first used in August 2005.

Beginning the Relationship

8.     In 2004, Swift approached Siddle about finding a pharmacy to serve Medicaid customers.

9.     In the spring of 2005, Siddle contacted Swift indicating Schaltenbrand was interested in a business relationship.  Swift suggested forming a partnership in which Medicate would

8

provide mail order pharmacy services to customers DeliverMed identified and recruited using direct mailings, call centers, and other marketing strategies.  The customers would include Illinois Medicaid patients from the contract DeliverMed hoped to get with the State of Illinois.

10.     In July 2005, Swift, Schaltenbrand and Siddle formed an oral general partnership to build a book of mail order pharmacy customers, to serve those customers, to divide the profits from that enterprise, and then to sell the book of customers to another business.  The testimony that Sickon was a partner rather than Swift is belied by the fact that Swift alone represented and acted on behalf of DeliverMed without substantive consultation with or direction from Sickon.  He also negotiated the partnership for his own financial benefit, not Sickon's.  Indeed, Swift's affidavit in support of DeliverMed's motion for a preliminary injunction (Doc. 2), which does not even mention Sickon as a partner, is consistent with this finding.  Swift, in practice, controlled DeliverMed.

11.     The oral partnership took the form of a joint venture ("JV") in which DeliverMed would provide marketing services to promote the mail order pharmacy services and Medicate would provide the mail order pharmacy services to customers attracted by DeliverMed's marketing.  Income from the mail order pharmacy business would be used to pay the costs of DeliverMed's marketing and Medicate's mail order pharmacy services.  Any remaining income after costs were paid was to be split among Schaltenbrand, who would receive 50%, Swift, who would receive 40%, and Siddle, who would receive 10%.

12.     The agreement between Swift, Schaltenbrand and Siddle did not include an agreement to employ Swift or to pay him a salary.

13.     Swift entered into the JV with the intention of taking more partnership distributions than

he was due.  He was able to do so by commingling the amounts he claimed in

distributions and the amounts DeliverMed claimed in cost reimbursements.  He was also

able to convince Schaltenbrand that he should take out and personally guarantee loans for

the JV, that the JV was more profitable than it really was and that the JV could afford to

make the partnership distributions he requested.  As long as he was able to obtain the

distributions he desired, he was not concerned with the actual financial condition of the

JV or with excessive distributions to Schaltenbrand or Siddle.

14.     Schaltenbrand entered into the JV with the intention of using part of the increased

income to Medicate to pay his personal debts and expenses.  He had been able to do this

when he held the sole interest in Medicate's income stream, and he viewed the JV as a

means to increase the money flowing into Medicate from which he could pay personal

debts and expenses.  As long as he was able to pay personal debts and expenses from

Medicate's income, he was unconcerned with the financial condition of the JV or with

excessive distributions to Swift or Siddle.  He was also unreasonably and willfully

ignorant about the consequences of personally guaranteeing Medicate's loans based on

Swift's assurances that the sale of the book of mail order business would yield sufficient

profits to cover his liability.

15.     Swift knew at the time that Schaltenbrand had been paying some personal debts and

expenses from Medicate's income and saw nothing improper about that practice.

16.     DeliverMed, in conjunction with Medicate, secured the contract with the State of Illinois

to provide mail order pharmacy services to Illinois Medicaid patients.

Operation of the JV

17.     In August 2005, the name "DeliverMed" was used commercially for the first time to

10

identify mail order pharmacy services provided by Medicate in furtherance of the JV. The mark was used to distinguish Medicate's mail order pharmacy services in furtherance of the JV from similar services provided by others.  Swift and DeliverMed directed, encouraged and approved of Medicate's use of the mark at the time. DeliverMed never commercially used the name "DeliverMed" to identify pharmacy services it provided because DeliverMed, by itself, never provided any pharmacy services.

18.     Since the income generated by the JV was generated by prescription sales and was paid to Medicate, Medicate was responsible for paying the costs of DeliverMed's marketing and its own mail order pharmacy services before allocating and paying partnership distributions.  At Swift's direction, Medicate made payments to Swift, Sickon, DeliverMed or vendors providing marketing services to DeliverMed regardless of whether the person or entity was legally entitled to the payment.  Schaltenbrand approved all payments before they were made by Medicate but he did not have a full understanding of the justification for those payments and relied on Swift to request the appropriate amounts.

19.     The accounting firm Schaltenbrand and Schaltenbrand ("S&S") kept the books for Medicate, including keeping segregated records of the finances attributable to the provision of mail order pharmacy services through the JV.  Larry Sr., Schaltenbrand's father, and Larry Jr., Schaltenbrand's brother, are the partners of S&S.

20.     Medicate determined the amount of income from the JV by using monthly "adjudicated revenue" reports reflecting mail order prescription income.

21.     In the absence of any history of providing mail order pharmacy services, Medicate

11

estimated that the fixed cost of filling each mail order prescription (overhead, salaries, mailing, etc.) was an average of $7.00.  It therefore counted and retained $7.00 per prescription as a cost to Medicate for providing mail order pharmacy services.

22.     Beginning in August 2005, DeliverMed's marketing efforts for the JV generated substantial new business for Medicate from Illinois Medicaid patients and patients recruited through other means.

23.     Schaltenbrand opened and/or maintained bank accounts at U.S. Bank and at the Bank of O'Fallon affiliated with the JV tax identification number without specifically informing Swift or Siddle of the existence of those accounts.

24.     In September 2005, Swift filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Code listing no partnership assets (Case No. 05-35255 (Bankr. N.D. Ill.)).

25.     Beginning in early October 2005, Swift began regularly requesting partnership distributions for which he knew there was no sound financial basis based on the JV's income stream.  Swift claimed he was entitled to distributions in excess of what the financial statements warranted because Schaltenbrand had taken excess distributions to pay his own personal expenses and/or because the excess distribution was in-line with what Swift knew was an unreasonable and unreliable estimate of the JV's profitability. The result was that Swift and Schaltenbrand were payed more than they were actually due under the JV partnership agreement.

26.     In the summer and fall of 2006, Swift, Schaltenbrand and Siddle began talking in earnest about selling the mail order book of business as had been agreed at the formation of the partnership.  Swift conducted a search for potential buyers and determined that there was interest in buying out Schaltenbrand's interest in the JV.  Schaltenbrand was particularly

12

interested in selling before his marriage to Teresa in September 2006.  No sale took place.

27.     In May and September 2006, Schaltenbrand received distributions from the JV leaving little money in the pool of profits to be distributed.  Schaltenbrand also began regular monthly payments from Medicate's income to his ex-wife Lisa.

28.     In 2006, Swift received distributions from the JV, but he was not provided a Schedule K-1 (Form 1065) partnership statement or a Form 1099.

29.     No partnership tax return was filed on behalf of the JV for 2005 or 2006.

30.     On December 5, 2006, an Illinois court issued an order in Schaltenbrand's divorce proceedings barring Schaltenbrand from transferring or encumbering his interest in Medicate without 30-days notice to his ex-wife Lisa.

31.     On March 6, 2007, Sickon purported to transfer a 30% ownership interest in DeliverMed to Swift.  Swift officially assumed responsibility for managing DeliverMed's financial, marketing and other business activities involving the JV.

32.     In December 2007, Sickon elected Swift to serve on and chair the DeliverMed Board of Directors.  She also purported to transfer an additional 45% ownership interest in DeliverMed to Swift, making him a 75% owner.

33.     In late 2007, Schaltenbrand realized it was too cumbersome for S&S to keep segregated records of the finances attributable to the provision of mail order pharmacy services through the JV.  To avoid the need for keeping separate mail order reckonings, he proposed modifying the JV to include a split of the profits of Medicate's Washington Park operations (from which the mail order services were provided) and a revised percentage split.  Washington Park books were already kept independently of the overall

13

Medicate operation.

34.  In 2007, Swift received distributions from the JV, but he was not provided a Schedule K-1 (Form 1065) partnership statement.  In 2008 Medicate issued him a Form 1099-MISC for the year 2007 for "other income."  In 2011, Medicate issued Swift a different Form 1099-MISC for the year 2007 showing no income and issued DeliverMed a Form 1099-MISC for the year 2007 for "nonemployee compensation."

35.  Beginning in January 2008, Swift, Schaltenbrand and Siddle modified the JV as suggested by Schaltenbrand with 51.1% of Medicate's Washington Park pharmacy profits going to Schaltenbrand, 35.9% going to Swift, and 13% going to Siddle.  In addition, Swift became an employee of Medicate receiving a salary of $1,000 per week and received a signing bonus of $151,000 in appreciation for the work he had previously done for the JV.  Medicate was to pay the bonus as funds became available.  Eventually Medicate paid all but $50,333 of this bonus to Swift.

36.  The revised percentage split of the Washington Park pharmacy profits reflected an approximate actuarial equivalent of the prior percentage split of the mail order business profits.

37.  Although the parties discussed the possibility of creating a new corporate entity to own and operate Medicate's Washington Park pharmacy, they never agreed to actually do that.  In the end, the modified JV arrangement did not include any transfer of any ownership interest in Medicate as a whole or in Medicate's Washington Park pharmacy and did not include an agreement to form a new corporate entity to own and run the Washington Park pharmacy.

38.  The vast majority of Swift's duties as an employee of Medicate were administrative or

professional duties that required independent judgment and specialized training and expertise in business and marketing.

39.     During the existence of the JV, Schaltenbrand paid some personal expenses from Medicate's income (e.g., monthly maintenance for his ex-wife Lisa).

40.     Until approximately September 2009, Swift had access to Medicate's financial records. Some of those records reflected payment of Schaltenbrand's personal expenses.

41.     During the life of the JV, Medicate obtained several sizable lines of credit from the Bank of O'Fallon to pay marketing expenses of the JV.  Those lines of credit were guaranteed by Medicate's accounts receivable and inventory and/or by Schaltenbrand personally. Schaltenbrand took out and personally guaranteed the lines of credit for Medicate on Swift's advice that such actions would increase the sale value of the mail order book of business.  Neither Swift, DeliverMed nor Siddle provided any guaranty for any of these lines of credit.  Swift's testimony to the contrary is patently incredible in light of Adkins' testimony that there was no such guarantee and the irregularity of the document Swift claims was such a guarantee.

42.     In 2008 and 2009, Swift received distributions from the JV and salary and bonus payments from Medicate, but he was not provided a Schedule K-1 (Form 1065) partnership statement.  However, Medicate issued him a Wage and Tax Statement (Form W-2) for the year 2008.  It also issued him a Form 1099-MISC for the year 2009 for "nonemployee compensation" and a Wage and Tax Statement (Form W-2) for the year 2009.

The Logo

43.     Deeter is employed by and is executive vice president of Deeter Associates, an

15

advertising and public relations company located in Doylestown, Pennsylvania. Deeter is

not a graphic designer and does not do any drawings, whether by hand or by computer.

Deeter Associates does not have in-house graphic designers.

44.    Kovin is a graphic designer. He owns and works for Kovin Design, a commercial art and

graphic design firm.

45.    In early 2008, Swift, acting as an agent of the JV, retained Deeter Associates to design a

two-dimensional ("2-D") logo for use on JV business and promotional materials in

furtherance of the JV's purposes. The placement of the phrases "Medicate Pharmacy

DeliverMed" or "DeliverMed Medicate Pharmacy" with the "house and pestle" logo on

many of the resulting business and promotional materials at Swift's request is strong

evidence that he obtained the creation of the logo on behalf of the JV, not DeliverMed or

himself individually. Additionally, at that time Swift was working exclusively for the JV

and not any other business entity.

46.    In 2008, Kovin and Deeter Associates entered into an oral agreement for freelance design

services to design a logo for Deeter Associates' client, the JV. Kovin did not know the

identity of the client at the time but referred to the client as "DeliverMed." In reality, the

JV was Deeter Associates' client. There was no written contract for Kovin's design

services. Deeter was acting as an agent for Deeter Associates and was Kovin's contact

person at Deeter Associates. Deeter oversaw his work and was the liaison between

Kovin and Deeter Associates' client.

47.    Kovin, while working for Kovin Design, created the "house and pestle" logo in the spring

of 2008. To arrive at the final design, Kovin created potential logo designs and presented

them to Deeter for her opinion about which were best to present to the client. Deeter

16

would present those designs usually to John Tollefson (a Medicate independent

contractor involved, at Swift's request, with promoting the JV), Tollefson would consult

with Swift and give Deeter feedback, and Deeter would convey the feedback to Kovin,

who would then modify the design accordingly until Swift was happy with the final

design.  Deeter did not create the 2-D artwork for the logo.

48.     Kovin was the sole creator of the logo.  Although Deeter, Swift and Tollefson provided

direction and ideas as to the color of the finished logo, neither they nor any other person

or entity participated in the creation of the logo by contributing any original expression

or reduced any idea to a fixed, tangible expression.

49.     Kovin was not an employee of Deeter, Deeter Associates, DeliverMed or Medicate at the

time he created the logo.  Kovin appeared confused when he testified that he was an

employee of Deeter Associates and that he received a W-2 from them.  He was not on the

payroll of Deeter Associates, and his description of the way he performs freelance work

on a project by project basis for numerous companies describes an independent

contractor, not employment, relationship.

50.     Kovin did not create the logo pursuant to a prior signed, written agreement with Deeter,

Deeter Associates, DeliverMed or Medicate that the logo would be a work made for hire.

51.     At the time the logo was created, Kovin intended that it would be used by Deeter

Associates' client, but this intent was not memorialized in writing.

52.     Kovin delivered the finished logo, including designs of materials on which the logo was

to appear, to Deeter Associates through its agent Deeter, intending Deeter Associates'

client to copy and distribute the logo.

53.     In April 2008, Kovin sent a bill to Deeter Associates, and Deeter Associates paid Kovin

Design $2,500 for designing the logo as well as implementation of the logo to business stationery. Kovin's bill to Deeter Associates made no mention of a transfer or assignment of a copyright in the logo.

54. The logo was placed on various pieces of promotional material and business documents in furtherance of the JV. Neither Kovin, Deeter, Deeter Associates, Swift or DeliverMed objected to this use of the logo.

55. In the summer of 2008, the logo was used commercially for the first time to identify mail order pharmacy services provided by Medicate in furtherance of the JV. The mark was used to distinguish Medicate's mail order pharmacy services in furtherance of the JV from similar services provided by others. DeliverMed never commercially used the logo to identify pharmacy services it provided because DeliverMed, by itself, never provided any pharmacy services.

56. Kovin did not assign the logo copyright to Deeter or Deeter Associates by oral or written agreement in 2008. Kovin's testimony that he intended to transfer the copyright in 2008 is not credible. Kovin and Deeter did not discuss or even contemplate the transfer of the logo copyright at that time. Kovin's and Deeter's testimony reflected a more pedestrian view of the agreement to develop a logo without consideration of intellectual property technicalities: Kovin would draw a logo and Deeter Associates would pay him for his efforts and allow its client to use it. Additionally, Kovin's manner while testifying suggested a recent fabrication of old intentions, motivated by a desire to please Deeter Associates, a potential client, that did not truly exist at the time. The preponderance of the evidence shows that the 2008 agreement between Kovin and Deeter Associates was not an agreement, oral or otherwise, to transfer a copyright.

18

57.     In October 2008, Deeter Associates sent a bill to DeliverMed, care of Swift, that included

        charges for Kovin's work on the logo.  Subsequently, Swift forwarded the bill to

        Medicate for payment.

58.     In March 2009, Medicate paid the bill from Deeter Associates that included charges for

        Kovin's work on the logo.

59.     On March 24, 2009, Swift obtained a service mark registration in the USPTO principal

        register for the tagline "Right at Home" for mail order pharmacy services (Reg. No.

        3594146).

        The Souring of the Relationship

60.     In the summer of 2009, trouble developed between DeliverMed and Swift, on one side,

        and Medicate, Schaltenbrand and Siddle, on the other side.  Swift suffered a health crisis

        and asked for payment of distributions he believes Medicate owed him.  He also first

        learned of the court order limiting Schaltenbrand's ability to transfer assets without

        notifying his ex-wife.

61.     On September 1, 2009, Swift manifested his will to dissociate himself from the JV

        partnership by having his attorney Kyle Berry send a letter to Schaltenbrand expressing

        his desire to dissolve the partnership.  Swift confirmed this desire by embarking on a

        course of conduct aimed at destroying the JV mail order pharmacy business, thus

        rejecting any further duties to the partnership.

62.     Several days later, in response to Berry's letter, Schaltenbrand notified Swift that he had

        been terminated as an employee of Medicate as of September 1, 2009.  Medicate stopped

        paying his $1,000/week salary.

63.     Medicate failed to pay the remainder of Swift's $151,000 signing bonus upon his

19

termination because it believed that debt would be accounted for in the winding up of the partnership.  Later, it believed in good faith that Swift had been overpaid in distributions, which would offset the unpaid bonus.

64.     Attempts to wind up the partnership began but were unsuccessful.

65.     In October 2009, in an effort to "crash" the business of Medicate to gain leverage in partnership dissolution negotiations, Swift diverted incoming toll-free customer telephone lines from Medicate to his personal cell phone and/or to ProCare Pharmacy, another mail order pharmacy, without Medicate's permission.  Swift also arranged for JV mail order pharmacy customers to be contacted and encouraged to fill their prescriptions at pharmacies other than Medicate.

66.     On September 21, 2009, on behalf of DeliverMed, Swift filed a UCC-1 financing statement purporting to secure an interest in Medicate's assets without any legitimate basis for that claim and solely for the purpose of harassing the defendants.

67.     On November 4, 2009, an attorney for DeliverMed sent a "cease and desist" letter to Schaltenbrand demanding he and Medicate stop using the "DeliverMed" name.  The letter did not request Medicate stop using the logo.  The request to stop using the "DeliverMed" name "in any and all forms" cannot be reasonably construed as a request to stop using the logo, which does not contain the "DeliverMed" name.

68.     The defendants did not use the "DeliverMed" name or the "Right at Home" tagline in connection with providing pharmacy services any time after Schaltenbrand received the cease and desist letter.

69.     On November 2, 2009, Swift falsely informed the Bank of O'Fallon that DeliverMed and Swift had initiated a Chapter 7 involuntary bankruptcy against Medicate.

20

70.     In response to Swift's conduct, Medicate posted on its website a notification to its

customers.  The notification stated:

> DELIVERMED ILLEGALLY OBTAINED A LIST OF OUR
> PATIENTS.
>
> Please be aware that DeliverMed, a marketing company is illegally using a
> copy of a list of our customers and phone numbers.  They are trying to
> solicit your service by spreading false information about Medicate
> Pharmacy.
>
> THIS SWITCH WAS NOT AUTHORIZED BY MEDICATE
> PHARMACY.  We want to reassure you that we have not filed
> bankruptcy, nor or [sic] we being investigated by the States Attorney
> Generals Office.  We will continue to service you by filling your
> prescriptions as we have been.  We are legally working to get these
> harassing phone calls stopped.  If someone posing as DeliverMed, or other
> company, calls you to switch from Medicate Pharmacy, please call us at 1-
> 877-222-0752.  Please note that Medicate Pharmacy does not work with
> DeliverMed.
>
> We apologize for any confusion or inconvenience this may cause you.
> Unfortunately, in this day and age, this type of trickery is all too common.
>
> If you have any questions regarding this situation, please contact Medicate
> Pharmacy at 1-877-222-0752.

The notice indicates it is from Schaltenbrand as President of Medicate.

71.     DeliverMed did not, in fact, illegally obtain a list of Medicate's mail order pharmacy

customers.  It had obtained the list in its solicitation of customers for the JV.

72.     In early 2010, Schaltenbrand increased his own salary from Medicate such that there

were no profits remaining to be divided among the JV partners.

73.     On February 2, 2010, Swift filed the Swift Action.

74.     On March 24, 2010, DeliverMed filed the DeliverMed Action.

75.     On March 30, 2010, Swift, on behalf of DeliverMed, applied for trademark registration

for the "house and pestle" logo for mail order pharmacy services.  On the application,

Swift represented that the logo was first used on January 1, 2007.  Swift knew at the time

of the application that the logo did not come into existence until 2008 and that it could

not possibly have been used on January 1, 2007.  Swift also declared in the application

that he believed that DeliverMed owned the mark and that no other entity had the right to

use it in commerce.  Swift knew at the time of the application that the logo had been

created for use in conjunction with the JV's mail order pharmacy services – services

which DeliverMed was unable to provide on its own because it was not a licensed

pharmacy – and that the JV had the right to use, and indeed had used, the mark in

providing mail order pharmacy services.  Swift's misrepresentations in the logo

trademark application were intentional falsehoods.  Swift was motivated to make these

misrepresentations by a desire to gain an advantage in his ongoing business dispute with

the defendants over the JV.

76.     Shortly after the DeliverMed Action was filed, Medicate stopped using the logo on

promotional material and business documents in response to DeliverMed's motion for a

temporary restraining order.  It also removed the notice referring to DeliverMed and has

not referred to DeliverMed on its website since then.

77.     By using the "DeliverMed" name, the "Right at Home" tagline and the "house and

pestle" logo, the defendants never intended to convey the message – and indeed did not

convey the message – to the public that the mail order pharmacy services Medicate

provided were actually provided by DeliverMed.  No JV mail order customer thought

DeliverMed was providing mail order pharmacy services because Medicate used the

"DeliverMed" name, the "Right at Home" tagline or the "house and pestle" logo.  The

defendants' use of the "DeliverMed" name, the "Right at Home" tagline and the "house

and pestle" logo was unlikely to cause confusion as to the origin of the pharmacy services provided.

78. On February 11, 2011, DeliverMed obtained a service mark registration in the USPTO principal register for the "house and pestle" logo for mail order pharmacy services (Reg. No. 3,913,346).

79. On April 1, 2011, DeliverMed submitted an application for a copyright in the logo. At Swift's direction, the copyright application submitted on behalf of DeliverMed stated that Deeter was the author of the logo. Swift knew at that time that Deeter had not participated in the creation of the logo by contributing any original expression and had not reduced any idea to a fixed, tangible expression such that she could be considered an author. At Swift's direction, the copyright application submitted on behalf of DeliverMed also stated that Deeter had transferred her copyright to DeliverMed by written agreement. As of the date of the application, Swift knew that Deeter had neither transferred nor agreed to transfer in writing any copyright to DeliverMed. Swift did not attempt to correct these misrepresentations. These misrepresentations on the copyright application were intentional falsehoods directed by Swift for the purpose of wrongfully obtaining a copyright to which DeliverMed had no legitimate claim. Swift was motivated to make these misrepresentations by a desire to gain an advantage in his ongoing business dispute with the defendants over the JV.

80. On April 8, 2011, Deeter, individually and as vice president of Deeter Associates, executed a document entitled "Agreement For Assignment of Copyright" which provided that "Deeter and Deeter Associates will assign a copyright in the logo of a house and pestle created by Linda Deeter and Deeter Associates for DeliverMed," Pl. Ex. 44, to

DeliverMed.  Under that agreement, Deeter is to execute an assignment of the copyright at some point in the future, and payment of consideration to Deeter would occur following that assignment.  The plain language of the "Agreement for Assignment of Copyright," Pl. Ex. 44, establishes no present transfer to DeliverMed of any rights in the logo.

81.    On April 9, 2011, the United States Copyright Office issued a certificate of registration of the logo (VA 1-766-676) listing Deeter as the author by virtue of the work being made for hire and listing DeliverMed as the copyright claimant by virtue of a written agreement of transfer.

82.    On July 27, 2011, Deeter, Deeter Associates and DeliverMed first pled a copyright infringement claim in this case.

83.    On March 20, 2012, Kovin executed a document entitled "Copyright Rights Assignment" purporting to transfer to Deeter all his rights in the copyright of the logo.  As evident from his agreement to "*hereby* assign . . . all of his rights of copyright" (emphasis added) in the logo, Kovin did not view this document as a memorialization of the transfer of a copyright in 2008 but as a measure to transfer in 2012 any copyright interest he may still have retained in 2012.

84.    Kovin received no consideration in exchange for this promise to transfer to Deeter his copyright in the "house and pestle" logo.

85.    At the time Deeter testified at trial, neither she nor Deeter Associates had received any payment from DeliverMed pursuant to the April 8, 2011 "Agreement For Assignment of Copyright."  Although Swift testified that he wired $5,000 to Deeter Associates prior to the trial, no documentation of such a transfer was ever introduced into evidence.

86.     Unbeknownst to the defendants until the trial, the logo continues to appear in a telephone directory advertisement on the DexKnows website.  The defendants are not responsible for the continuing appearance of the logo on this website.

87.     Neither Kovin, Deeter, Deeter Associates, Swift nor DeliverMed has suffered any lost profits from the defendants' use of the logo to further the JV.

## IV.   Conclusions of Law

The Court has original jurisdiction over the DeliverMed Action under 28 U.S.C. §§ 1331 and 1338(a) and (b).  Count I presents a *bona fide* federal question requiring interpretation of the Copyright Act, 17 U.S.C. § 101 *et seq.*:  whether Deeter, Deeter Associates or DeliverMed owns the copyright in the "house and pestle" logo, an essential element for their claim for copyright infringement under the Copyright Act, 17 U.S.C. § 501.  *See Gaiman v. McFarlane*, 360 F.3d 644, 652-53 (7th Cir. 2004);  *compare International Armor & Limousine Co. v. Moloney Coachbuilders, Inc.*, 272 F.3d 912, 916 (7th Cir. 2001) (no federal question jurisdiction over Lanham Act claim because resolution turned on state contract law, not federal law).  It also has jurisdiction over Counts II and III because they involve *bona fide* questions requiring interpretation of federal trademark law.  The Court has supplemental jurisdiction over the remaining claims in the DeliverMed Action under 28 U.S.C. § 1367(a) because those claims are so related to claims in Counts I, II and III, the Copyright Act and Lanham Act causes of action, that they are part of the same case or controversy.

The Court has original jurisdiction over the Swift Action under 28 U.S.C. § 1331.  Count VIII presents a federal question under the FLSA, 29 U.S.C. § 201 *et seq.*  The Court has supplemental jurisdiction over the remaining claims in the Swift Action (Counts VI-XII) under 28 U.S.C. § 1367(a) because those claims are so related to claims in Count VIII, the FLSA cause

of action, that they are part of the same case or controversy.

## DELIVERMED ACTION

A.     Copyright Claims

1.     Count I:  Copyright Infringement

This claim is brought by plaintiffs Deeter, Deeter Associates and DeliverMed against all

defendants for copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 501(a).  The

Plaintiffs claim that they own a valid copyright in the "house and pestle" logo (Copyright Reg.

VA 1-766-676) and that the defendants used the logo by reproducing it on Medicate's business

materials without authorization, thereby infringing on their copyright.

a.     Law on Copyright Infringement

In order to prevail on a claim for copyright infringement, the plaintiff must prove, among

other things, that he is an owner of the copyright in the work at issue.  *See Feist Publ'ns, Inc. v.*

*Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991);  *Incredible Techs., Inc. v. Virtual Techs.,*

*Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005).  Only the legal or beneficial owner at the time of the

alleged infringement may sue for the infringement.  *See* 17 U.S.C. § 501(b);  *HyperQuest, Inc. v.*

*N'Site Solutions, Inc.*, 632 F.3d 377, 381 (7th Cir. 2011);  *ABKCO Music, Inc. v. Harrisongs*

*Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991).  Generally, an owner may not sue for copyright

infringement until he has registered the copyright in the work at issue.  *See* 17 U.S.C. § 411(a);

*Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1241 (2010).

Ownership of a copyright is originally vested in the author of a work.  *See* 17 U.S.C. §

201(a).  Generally, the author is the creator of the work, that is, "the person who translates an

idea into a fixed, tangible expression entitled to copyright protection."  *Community for Creative*

*Non-Violence v. Reid*, 490 U.S. 730, 737 (1989);  *Schiller & Schmidt, Inc. v. Nordisco Corp.,*

26

969 F.2d 410, 413 (7th Cir. 1992).  However, this general rule may not hold true if a work is

"made for hire," that is, if it is made by an employee for an employer within the scope of the

employment or if it is a special type of work commissioned pursuant to an advance written

contract specifying the work is made for hire.  *See* 17 U.S.C. § 101;  *Schiller & Schmidt*, 969

F.2d at 413.  In those cases, the author is considered to be the employer or commissioner of the

work unless agreed in writing otherwise.  *See* 17 U.S.C. § 201(b);  *Community for Creative*

*Non-Violence*, 490 U.S. at 737;  *Schiller & Schmidt*, 969 F.2d at 413.

An author may transfer exclusive copyright interests to someone else, often called a

"beneficial owner."  *See Moran v. London Records, Ltd.*, 642 F. Supp. 1023, 1024-25 (N.D. Ill.

1986).  Unless by operation of law, the transfer of ownership must be by an express written

agreement signed by the owner of the rights conveyed.[1]  *See* 17 U.S.C. § 204(a);  *I.A.E., Inc. v.*

*Shaver*, 74 F.3d 768, 774 (7th Cir. 1996).  "The writing requirement serves the goal of

predictability and certainty of copyright ownership."  *I.A.E.*, 74 F.3d at 775.  An oral assignment

later ratified in writing can satisfy this requirement.  *See Imperial Residential Design, Inc. v.*

*Palms Development Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995);  *Eden Toys, Inc. v. Florelee*

*Undergarment Co.*, 697 F.2d 27, 36 (2d Cir. 1982);  *see also   Billy-Bob Teeth, Inc. v. Novelty,*

*Inc.*, 329 F.3d 586, 591 (7th Cir. 2003);  *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428 (9th

Cir. 1996) (discussing similar writing requirement in 1909 Copyright Act).  Thus, to show

ownership, a plaintiff must establish a written chain of title from the work's author to himself.

*Moran*, 642 F. Supp. at 1025.

---

[1]As discussed later in this order, a nonexclusive license can be transferred without a written
agreement, but the owner of a non-exclusive license is not entitled to sue for infringement.  *HyperQuest*,
632 F.3d at 382.  The plaintiffs in this case do not claim to have a nonexclusive license to use the logo.

The registration of a copyright is *prima facie* evidence of the facts stated in the certificate (such as, for example, ownership). 17 U.S.C. § 410(c). However, the presumption of ownership is rebuttable. *See Mid America Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995); *Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992); *Sandwiches, Inc. v. Wendy's Int'l, Inc.*, 654 F. Supp. 1066, 1071 (E.D. Wis. 1987). The party challenging the facts contained in the certificate bears the burden of coming forth with evidence to rebut the presumption. *See United Fabrics Int'l, Inc. v. C & J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011).

Ordinarily an infringing third party cannot challenge the ownership of a copyright by assignment where there is no dispute between the assignor and the assignee about the ownership of the copyright. *See Magnuson*, 85 F.3d at 1428-29; *Eden Toys*, 697 F.2d at 36. However, where the challenge is directed at a claim of ownership by authorship, as opposed to a claim of ownership only by assignment, this rule does not apply. *See In re Napster, Inc. Copyright Litigation*, 191 F. Supp. 2d 1087, 1097 (N.D. Cal. 2002).

b.    Application to Count I

Deeter, Deeter Associates and DeliverMed have failed to prove by a preponderance of the evidence that any of them owns the copyright in the "house and pestle" logo. Because this is an essential element of their copyright claim, they have not proved their claim and the defendants are entitled to judgment on Count I. The presumption of ownership by DeliverMed created by the Certificate of Registration (VA 1-766-676) has been rebutted by clear evidence that it is not the owner of the copyright, as explained below.

Kovin is the initial owner of the copyright. He is the sole individual who "translate[d] an idea into a fixed, tangible expression entitled to copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). Thus, he is the sole author in which the initial

28

copyright vested under 17 U.S.C. § 201(a).  There was no evidence that Kovin Design was an

entity independent of Kovin himself such that it could own the copyright as a work for hire.  The

Court finds that Kovin and Kovin Design are a single entity, one doing business as the other.  In

the absence of evidence showing an employment relationship, the Court concludes that Kovin is

the initial owner of the copyright in the logo.

Neither Deeter, Deeter Associates nor DeliverMed was the initial owner of the copyright

as a work for hire under 17 U.S.C. §§ 101 and 201(b).  They did not employ Kovin as an

employee to create the logo and did not commission the creation of the logo from him pursuant

to an advance written contract.  Thus, the logo was not a work made for hire.

Kovin did not agree in 2008 to transfer the copyright in the logo as part of his agreement

for design services with Deeter Associates.  Kovin and Deeter, on behalf of Deeter Associates,

reached an agreement that did not contemplate a copyright assignment.  They cannot now, in

retrospect, make more of the agreement than it really was.

Kovin's attempt to transfer his rights of copyright to Linda Deeter on March 20, 2012,

failed for lack of consideration.  It is a fundamental principle of contract law that an agreement

must be supported by consideration from both parties.  *See Steinberg v. Chicago Med. Sch.*, 371

N.E.2d 634, 639 (Ill. 1977) (citing *Moehling v. W. E. O'Neil Const. Co.*, 170 N.E.2d 100, 106

(Ill. 1960)).  Consideration is either "some right, interest, profit or benefit accruing to one party,

or some forbearance, detriment, loss of responsibility given, suffered or undertaken by the other.

The preexisting duty rule provides that where a party does what it is already legally obligated to

do, there is no consideration as there is no detriment."  *White v. Village of Homewood*, 628

N.E.2d 616, 618 (1993) (internal citations omitted).  Deeter never gave Kovin any consideration

for his assignment of his copyright to her.  Any consideration paid by Deeter Associates to

satisfy its 2008 agreement with Kovin Design is not valid consideration for Kovin's 2012 assignment because Deeter Associates was already obligated to pay – and indeed had already paid – Kovin Design that sum under the 2008 agreement.  Kovin's 2012 assignment was not supported by consideration.

Kovin's 2012 assignment is not merely a ratification of a copyright assignment that occurred in 2008.  First, as noted above, the 2008 agreement was not an oral agreement to transfer a copyright ownership interest.  Additionally, in 2008, Kovin performed work for *Deeter Associates* intending that the work would ultimately be owned by Deeter Associates' client, which he called "DeliverMed" but which was really the JV.  However, Kovin's 2012 assignment contemplates an assignment *to Deeter individually*, not Deeter Associates, the party to the 2008 freelance agreement to create the logo, or to the JV, Deeter Associates' client which Kovin intended in 2008 ultimately to use the logo.  Thus, the 2012 assignment terms are different than the 2008 oral agreement, and the 2012 assignment does not ratify the earlier oral agreement.

Furthermore, the 2012 assignment is phrased in the present tense, not as a ratification of a past event.  It states that Kovin wishes to transfer any interest he may have had in the logo and that, by the assignment agreement, he "*hereby* assign[s]" (emphasis added) those interests.  By its very terms, it is not a written confirmation that in 2008 he transferred his copyright interests by oral agreement but a new agreement under which he purports to transfer those same rights in 2012.  That agreement is not a ratification of an alleged oral transfer four years earlier.[2]

Nor did Deeter's April 8, 2011, "Agreement for Assignment of Copyright" transfer that

---

[2] Even had Kovin successfully transferred his copyright interests in the logo to Deeter in March 2012, Deeter herself is unable to sue for copyright infringement because she failed to register the assigned copyright in the logo, a precondition of suit, before bringing this copyright action on July 27, 2011.

copyright to DeliverMed such that it could bring this suit.  Her promise to transfer was an executory agreement, that is, a promise to do something in the future, not a contemporaneous assignment.  DeliverMed failed to show Deeter actually performed her promise to transfer any copyright interest in the logo.  Thus, it never acquired ownership of the logo copyright.

The defendants are not precluded from challenging DeliverMed's ownership of the logo because they are third parties to the 2011 attempted copyright assignment from Deeter to DeliverMed, the basis for DeliverMed's copyright registration.  Unlike *Magnuson* and *Eden Toys*, where the issue was the validity of an assignment that neither the assignor nor the assignee contested, the issue here is whether the assignor was actually the author and had authority to assign the copyright – or, as the case may be, to promise to do so in the future.  Additionally, Deeter and DeliverMed do *not* agree on whether the April 8, 2011, "Agreement For Assignment of Copyright" actually transferred the copyright at that time;  DeliverMed argues it did, but Deeter testified it did not.  Had Deeter been an author, and had she and DeliverMed agreed that the assignment was effective at that time and was valid despite the lack of a writing, the defendants might not have been able to challenge DeliverMed's ownership based on the lack of a written assignment.  However, that is not the case.

For these reasons, the Court finds that neither Deeter, Deeter Associates nor DeliverMed is the owner of the copyright in the "house and pestle" logo.  Thus, they have failed to establish copyright ownership, an essential element of a copyright infringement claim under 17 U.S.C. § 501(a), and the defendants are entitled to judgment on Count I.

c.     Affirmative Defense of License

Alternatively, the Court finds the defendants have established an affirmative defense to Count I based on a nonexclusive license to use the logo to advance the purposes of the JV.  A

31

defendant can overcome a claim for copyright infringement using the affirmative defense that his use of the copyrighted work was pursuant to a license. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir.1996).  In contrast to a transfer of copyright ownership, an author may allow others to use the copyrighted work in a certain manner by granting a nonexclusive license.  Unlike a transfer of copyright ownership, such licenses may be granted orally.  *Walthal v. Rusk*, 172 F.3d 481, 484 (7th Cir. 1999); *I.A.E.*, 74 F.3d at 775 (citing Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyrights* § 10.03[A]).  They may also be implied by the conduct of the parties. *I.A.E.*, 74 F.3d 775.  Where a copyright owner permits or fails to object to the use of his copyrighted work, he is deemed to have granted a nonexclusive license.  *Id.*  An implied nonexclusive license is granted when:

> (1) a person (the licensee) requests the creation of a work,  (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and  (3) the licensor intends that the licensee-requestor copy and distribute his work.

*Id.* at 776 (citing *Effects Assocs. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990)).  The Court should also consider other objective evidence of the copyright owner's intent.  *Id.* at 776.

In 2008, Kovin transferred a nonexclusive license to use the logo for an indefinite term to the JV through Deeter Associates for use in promoting the JV.  All the factors listed in *I.A.E.* indicate Kovin granted such a license.  Swift, acting as an agent of the JV, requested the creation of a logo to use in connection with the JV.  Kovin made the work and delivered it to Deeter Associates intending it ultimately be delivered to the client, the JV.  Kovin further intended the client to use the logo – including copying and distributing it – in furtherance of the JV's purposes, and he did not object when, in fact, the JV did so.  No objective evidence at trial suggests anything other than a nonexclusive license granted by Kovin to the JV.  Furthermore,

the use proved at trial was within the scope of the license in that it was used to promote the mail order pharmacy business.

The defendants have carried their burden of proving the affirmative defense that the JV, including partners Schaltenbrand and Siddle, had a nonexclusive license to use the logo in furtherance of the JV and that the use of the logo did not exceed the scope of the license.

For all of these reasons, the defendants are entitled to judgment on Count I.

2.    Counterclaim 1:  Declaration of Copyright Invalidity

This counterclaim is brought by defendants/counterclaimants Medicate and Schaltenbrand under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking a declaration that DeliverMed's copyright registration for the 2-D artwork known as the "house and pestle" logo (VA 1-766-676) is invalid and unenforceable.  They argue that the copyright registration is invalid because DeliverMed did not comply with statutory registration requirements set forth in 17 U.S.C. §§ 408 and 409.

An application for copyright registration must contain certain specified information, including the name of the author or authors of the work and a brief statement explaining how the claimant obtained ownership of the copyright.  *See* 17 U.S.C. § 409(2) & (5).  Only the owner of a copyright may apply for registration.  *See* 17 U.S.C. § 408(a).  As noted above, an owner must register a copyright before he may file a lawsuit for copyright infringement.  *See* 17 U.S.C. § 411(a);  *Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1241 (2010).

Inadvertent mistakes on the copyright registration certificate will not preclude the copyright owner from filing a copyright infringement action so long as the alleged infringer has not relied to his detriment on the mistake.  *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003) (citing *Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997)).

33

However, where the copyright applicant made a material misstatement intending to defraud the Copyright Office, the copyright registration can be declared invalid and cannot be used to support an infringement action.  *See LZT/Filliung P'ship, LLP v. Cody/Braun & Assocs., Inc.*, 117 F. Supp. 2d 745, 750-51 (N.D. Ill. 2000).  A material fact is one which might have caused the Copyright Office to reject the application.  *See Data General Corp. v. Grumman Sus. Support Corp.*, 36 F3d.1147, 1161 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010);  *LZT/Filliung P'ship*, 117 F. Supp. 2d at 750-51.

DeliverMed's copyright in the logo (VA 1-766-676) is invalid because it was obtained through fraud on the Copyright Office.  Swift, in directing the content of the copyright application, intentionally misrepresented that Deeter was the author of the work and that she had transferred her copyright to DeliverMed by written agreement.  As explained above, neither of these representations was true, and Swift was aware of this at the time he directed the application to be filed.  These misrepresentations were material because, had the application contained truthful information as to the authorship of the work and the facts supporting DeliverMed's claim to ownership, the Copyright Office would have rejected DeliverMed's application.  Truthful statements would have revealed that Swift had no claim to copyright ownership in the logo.  Swift purposefully caused these misrepresentations to be included in the application in an effort to gain an advantage in this lawsuit by deceiving the Copyright Office and causing it to issue DeliverMed a copyright registration to which it was not entitled.

For this reason, defendants Medicate and Schaltenbrand are entitled to judgment on Counterclaim 1, including a declaration that DeliverMed's Certificate of Registration VA 1-766-676 for the 2-D artwork known as the "house and pestle" logo is invalid.  This ruling serves as an alternative rationale for judgment in favor of the defendants on Count I, the copyright

34

infringement claim brought by Deeter, Deeter Associates and DeliverMed.

In light of the intentional wrongful acts of Swift on behalf of DeliverMed with respect to the copyright issue, the Court further believes it should exercise its discretion pursuant to 17 U.S.C. § 505 to award attorney's fees to all defendants, to be paid by DeliverMed, for their defense of Count I, the copyright infringement claim.  The Court declines to make Deeter or Deeter Associates responsible for the defendants' attorney's fees in light of their minimal participation in the prosecution of Count I, which has been driven primarily by DeliverMed.

B.  Lanham Act Claims

1.  Count II:  Trademark/Service Mark Infringement Based on Name, Tagline and Logo

This claim is brought under §43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by DeliverMed against all defendants for trademark infringement based on their use of the "DeliverMed" name, the "Right at Home" tagline and the "house and pestle" logo.  DeliverMed claims it owns all three marks and has a valid trademark registration on the principal register (Reg. No. 3,913,346) on the logo and on the supplemental register (Reg. No. 3,570,921).  It believes the defendants have infringed on its marks by using them in connection with Medicate's mail order pharmacy services.

a.  Law on Trademark Infringement

In order to prevail on a claim for trademark[3] infringement under §43(a) of the Lanham

---

[3]Technically the marks at issue in this case are service marks rather than trademarks.  A trademark is a designation used "to identify and distinguish" the *goods* of a person.  Lanham Act § 45, 15 U.S.C.A. §1127.  A service mark, on the other hand, is "a mark used in the sale or advertising of *services* to identify the services of one person and distinguish them from the services of others." *Id.* (emphasis added).  Because the name "DeliverMed," the tagline "Right at Home" and the "house and pestle" logo are used to identify mail order pharmacy services, as opposed to the prescription goods themselves, they are service marks.  The law is generally the same for trademarks and service marks, but is usually phrased in terms of trademarks.  Therefore, the Court will use the terms trademark and service mark interchangeably in this

Act, 15 U.S.C. § 1125(a), a plaintiff must show that it owns a valid and protectible mark and that

the defendant used the mark in interstate commerce in a manner likely to cause confusion as to

the origin of the product or service.  *See H-D Michigan, Inc. v. Top Quality Service, Inc.*, 496

F.3d 755, 759 (7th Cir. 2007);  *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001).

A service mark is "any word, name, symbol, device, or any combination thereof . . . used by a

person . . . to identify and distinguish the services of one person . . . from the services of others

and to indicate the source of the services, even if that source is unknown."  15 U.S.C. § 1127.  A

symbol can only qualify as a valid trademark if it is capable of identifying and distinguishing

goods or services that bear the symbol.  *Dunn v. Gull*, 990 F.2d 348, 351 (7th Cir. 1993).  A

symbol is said to have this capability if it is inherently distinctive or if it has become distinctive

by acquiring a secondary meaning that, in the mind of the public, identifies the source of the

service.  *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-11 (2000).

The first question in a Lanham Act trademark infringement case is "whether someone has

used a word or symbol to identify goods such that the word or symbol refers (at least in the eyes

of the law) only to that person's goods."  *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d

876, 882 (7th Cir. 1997).  The person who first uses a mark is sometimes said to "own" the

trademark, although a trademark is an "identifier" rather than an ordinary property interest.  *Id.*;

*see Heinemann v. General Motors Corp.*, 342 F. Supp. 203, 206 (N.D. Ill. 1972) ("trade or

service mark rights are acquired by appropriation and use").  A trademark gives a seller or

supplier of services "a 'property right' in his mark of identification, appurtenant to his property

rights in the goods [or services] he so marks, enabling the 'owner' of the trademark to enjoin

---

order.

[an] imposter from continuing misrepresentations." *Walt-West Enterps., Inc. v. Gannett Co.*, 695 F.2d 1050, 1057 (7th Cir. 1982). Trademarks are "protected only to the extent that they give consumers information about the origin or quality of products," *TMT*, 124 F.3d at 882, or, as the case may be, the origin of services. Trademark infringement law gives sellers or providers of services a way to prevent others from using similar marks to induce customers away by misleading them into thinking they are obtaining goods or services from the mark owner. *Id.* at 882.

Under § 1(a) of the Trademark Act, an owner of a trademark may apply to the USPTO to register a mark on the principal register. *See* 15 U.S.C. § 1051(a) (trademarks); 15 U.S.C. § 1053 (service marks). No one except the owner at the time of the application may apply for trademark registration, and an application made by someone other than the owner is void. *See* 37 C.F.R. § 2.71(d); Trademark Manual of Examining Procedure ("T.M.E.P.") § 1201.02(b) (5th ed. 2007); *Great Seats, Ltd. v. Great Seats, Inc.*, 84 U.S.P.Q.2d 1235, Canc. No. 92032524, 2007 WL 1740870, *5 (T.T.A.B. 2007). The USPTO will refuse to register a mark if the applicant is not the true owner. T.M.E.P. § 1201.02(b).

Registration on the principal register does not, by itself, convey ownership or validity, but it may help raise the bar for someone seeking to challenge the mark. Registration on the principal register is *prima facie* evidence of the validity of the mark, of the registrant's ownership of the mark, and of his exclusive right to use the mark in commerce in connection with the goods or services specified in the registration. *See* 15 U.S.C. § 1115(a). Additionally, if a mark has been registered on the principal register, has been in use for more than five consecutive years after the registration and meets other statutory requirements, it becomes "incontestable." *See* 15 U.S.C. § 1065. An incontestable mark can only be cancelled for a

limited set of reasons set forth in 15 U.S.C. § 1064.  Additionally, registration on the principal

register is conclusive evidence of validity, ownership and the right to exclusive use if the mark

has become incontestable.  *See* 15 U.S.C. § 1115(b).

   With few exceptions, a mark that is not registrable on the principal register for a reason

listed in 15 U.S.C. § 1052 can be registered on the supplemental register if the mark is capable of

distinguishing the registrant's goods or services from those of others.  Registration on the

supplemental register is not *prima facie* or conclusive evidence of validity, ownership or the

right to use the mark.  *See* 15 U.S.C. § 1094.  It creates no presumption of validity, ownership or

right to use.  *See Keystone Consol. Indus., Inc. v. Mid-States Distrib. Co.*, 235 F. Supp. 2d 901,

913, n.8 (C.D. Ill. 2002) (citing *In re Federated Dep' Stores Inc.*, Serial No. 457,760, 1987 WL

124292, 3 U.S.P.Q.2d 1541, 1543 (T.T.A.B. 1987)).

   As for the infringement element of a trademark infringement claim, there can be no

infringement unless the use of the mark was unauthorized.  If the owner of a trademark licenses

another to use it, as long as the licensee uses the mark within the scope of the license, the

licensee cannot infringe on the owner's trademark rights.  *See Segal v. Geisha NYC LLC*, 517

F.3d 501, 506 (7th Cir. 2008) ("[W]here the trademark holder has authorized another to use its

mark, there can be no likelihood of confusion and no violation of the Lanham act if the alleged

infringer uses the mark as authorized.").

### b.   Application to Count II

#### i.   "Right at Home" Tagline

   DeliverMed does not have standing to bring a trademark infringement claim based on the

"Right at Home" tagline because it does not have rights to the mark, an essential element of a

trademark infringement claim.  DeliverMed concedes this claim in its closing argument (Doc.

262 at 29:  "After reviewing the trial record, Plaintiffs do not contest that they lack standing to

bring suit for infringement of the 'Right at Home' service mark.").

Furthermore, DeliverMed has not carried its burden of proof that it has a valid and

protectible trademark in the "Right at Home" tagline in connection with pharmacy services and

that any defendant used that mark in interstate commerce in a manner likely to cause confusion

as to the origin of pharmacy services or as to an affiliation between DeliverMed and Medicate.

Thus, the defendants are entitled to judgment on Count II to the extent it is based on the "Right

at Home" tagline.

ii.      "DeliverMed" Name

With respect to the name "DeliverMed," the Court need not address whether the mark is

able to constitute a valid trademark because it is either inherently distinctive or has become

distinctive by acquiring a secondary meaning.  Even if it were distinctive, DeliverMed does not

own it.

As a preliminary matter, DeliverMed is entitled to no presumption of ownership in the

"DeliverMed" name to identify the source of retail pharmacy services.  Its registration of the

name was on the supplemental register (Reg. No. 3,570,921), not the principal register, so it is

not entitled to any evidentiary benefits provided by 15 U.S.C. § 1115.

The preponderance of the evidence shows that DeliverMed does not have an interest in

the service mark "DeliverMed" to identify pharmacy services because DeliverMed, by itself,

never used the name in commerce in a manner that allowed consumers to identify pharmacy

services it provided.  In fact, it never provided any pharmacy services but only marketing

services to further the purposes of the JV.  On the contrary, the "DeliverMed" name was used,

often in combination with "Medicate Pharmacy," to indicate Medicate was the origin of the

39

pharmacy services provided.  DeliverMed never used the name "DeliverMed" to identify

pharmacy services provided by DeliverMed such that it acquired a service mark for the

"DeliverMed" name to identify the source of services.  Thus, DeliverMed does not own the

service mark "DeliverMed" to identify the source of pharmacy services.

Furthermore, DeliverMed has not carried its burden of proving that any defendant used

the name "DeliverMed" in interstate commerce in a manner likely to cause confusion as to the

origin of pharmacy services or as to an affiliation between DeliverMed and Medicate.  The

defendants only used the "DeliverMed" name to identify pharmacy services Medicate provided

in furtherance of the JV, an actual affiliation between DeliverMed and Medicate.  No defendant

ever used the "DeliverMed" name at any time to identify any other pharmacy services.  In the

absence of use of the service mark to identify pharmacy services other than Medicate's or any

other good or service, there could be no confusion as to the source of any services.  To the extent

there was any confusion surrounding the "DeliverMed" name after the relationship between

DeliverMed and Medicate soured, it was caused by customers' inability to fill prescriptions with

Medicate after Swift diverted telephone lines away from Medicate to other destinations.  This

was certainly not a result of the use of the "DeliverMed" name by Medicate.

Alternatively, the Court finds the defendants had a license to use the mark to advance the

purposes of the JV.  Even if DeliverMed had valid service mark rights in the "DeliverMed"

name, it gave the defendants a license to use the mark in furtherance of the JV at the

commencement of the JV.  At Swift's direction and without objection from DeliverMed, the

defendants used the name "DeliverMed" on the business and promotional materials in

furtherance of the JV and on the prescription drugs Medicate provided to mail order pharmacy

customers.  The first time DeliverMed asked the defendants to stop using the "DeliverMed"

40

name was in the November 4, 2009, cease and desist letter written to Schaltenbrand on behalf of DeliverMed.  This letter demanded that he and Medicate stop using the "DeliverMed" name, and they complied with that demand.  Thus, the defendants' use of the mark was entirely within the license, so they cannot be infringers.

For these reasons, the defendants are entitled to judgment on Count II to the extent it is based on the "DeliverMed" name.  The Court need not reach the issue of whether the "DeliverMed" name is distinctive or descriptive such that any party could own it as a service mark.  It need only find here that DeliverMed, by itself, does not.

iii.   <u>"House and Pestle" Logo</u>

The preponderance of the evidence shows that DeliverMed does not have a trademark interest in the "house and pestle" logo.

DeliverMed registered the logo on the principal register (Reg. No. 3,913,346), and that registration is *prima facie* evidence of the validity of the mark, of DeliverMed's ownership of the mark and of its exclusive right to use it.  However, because DeliverMed has not used the mark in commerce for five consecutive years following registration, the registration is not conclusive evidence of those facts.  The defendants have met their burden of overcoming the presumption of ownership created by the registration.  The evidence shows that, despite DeliverMed's registration of the logo, it is does not have trademark rights in the logo.

As with the "DeliverMed" name, DeliverMed never used the logo to identify pharmacy services because DeliverMed never provided pharmacy services.  The logo was first used beginning in the summer of 2008 to identify that mail order pharmacy services were provided *by Medicate*.  Thus, DeliverMed does not own the mark to identify the source of pharmacy services.

Furthermore, the defendants did not use the logo in interstate commerce in a manner

41

likely to cause confusion as to the origin of pharmacy services or as to the affiliation between DeliverMed and Medicate.  The defendants only used the logo to identify pharmacy services Medicate provided, not to identify services from any other source.  In the absence of use of the logo to identify pharmacy services other than Medicate's or to identify any other good or service, there could be no confusion.

Alternatively, the defendants had a license to use the mark to advance the purposes of the JV.  Even if DeliverMed had valid service mark rights in the logo, as with the "DeliverMed" name, it gave the defendants a license to use the mark in furtherance of the JV.  DeliverMed did not object to the use of the logo until the commencement of this litigation in March 2010, when it requested a temporary restraining order prohibiting the defendants from using the logo.  In response, the defendants stopped using the logo.  Any continued appearance of the logo on the DexKnows website is not attributable to the defendants.  Thus, the defendants' use of the logo was entirely within the license, so they cannot be infringers.

For these reasons, the defendants are entitled to judgment on Count II to the extent it is based on the "house and pestle" logo.

2.     Count III: Unfair Competition Based on Name, Tagline and Logo

This claim is brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by DeliverMed against all defendants for unfair competition based on their use of the "DeliverMed" name, the "Right at Home" tagline and the "house and pestle" logo.  DeliverMed believes the defendants have engaged in unfair competition by using those marks without authorization.  This part of Count III mirrors Count II, its claim for trademark infringement, except that it includes the phrase "unfair competition."  DeliverMed also asserts the defendants made false claims

against DeliverMed on Medicate's website.  *See* Final Pretrial Order at 3-4.[4]

The Lanham Act's purposes include making "actionable the deceptive and misleading use of marks" and "protect[ing] persons engaged in . . . commerce against unfair competition." 15 U.S.C. § 1127.  However, the act is limited to certain kinds of unfair competition listed in the statute.  Here, DeliverMed claims the defendants have used their marks to falsely designate the origin of the mail order pharmacy services provided by Medicate and to falsely indicate an association with DeliverMed in a way that is likely to cause confusion to consumers about the service.[5]

---

[4]To the extent the claim as set forth in the Final Pretrial Order differs from the claim as articulated in the pleadings, the Final Pretrial Order supersedes those pleadings and controls the course of the action. *See Rockwell Intern. Corp. v. United States*, 549 U.S. 457, 474 (2007);  *Erff v. MarkHon Indus., Inc.*, 781 F.2d 613, 617 (7th Cir. 1986);  Fed. R. Civ. P. 16(e).

[5]The analysis of Count III is complicated because the parties are not clear on exactly what DeliverMed must prove to prevail on its unfair competition cause of action.  DeliverMed has given the Court three versions of the elements of its claim, and the defendants have given two, all of which differ from each other.  In the plaintiff's trial brief on the elements of its claims (Doc. 197), DeliverMed represents that these are the elements:
>  1) That the mark is distinctive;
>  2) That Plaintiff owns the mark;
>  3) That the mark has been properly registered;
>  4) That the Defendants have used a similar mark.
It cites only the statute in support of its position.
>  In its proposed jury instructions (before the parties agreed to try this case to the Court), DeliverMed represents that these are the elements:
>  1. Plaintiff owns the [marks] . . .;
>  2. [The marks] are valid trademarks. . . .;
>  3. Defendants, or some of them, used the [marks] in interstate commerce. . . .;
>  4. Defendants, or some of them, used the [marks] in a manner that is likely to cause confusion, mistake, or deception as to the source or origin of defendant's product.
It cites 7th Circuit Pattern Jury Instruction 13.1.2.1, which deals with ownership and priority of unregistered and contestable marks.
>  In its post-trial brief (Doc. 262), DeliverMed represents that these are the elements:
>  1. The defendant uses the designation;
>  2. in interstate commerce;
>  3. in connection with goods or services;
>  4. which designation is likely to cause confusion, mistake or deception as to origin, sponsorship or approval of defendant's goods or services; and
>  5. DeliverMed Holdings has been or is likely to be damaged by these acts.
It cites the statute and *First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc.*, 923 F. Supp. 693, 707 (E.D. Pa. 1996).
>  On the other side, in their motion for judgment as a matter of law (Doc. 255), the defendants

As explained above in connection with Count II, the defendants did not use the marks at issue to falsely designate the origin of the mail order pharmacy services provided by Medicate. The marks had always been used to identify mail order pharmacy services provided by Medicate, and those services were indeed provided by Medicate.  To the extent the use of the marks may have indicated an association between Medicate and DeliverMed in the JV to provide mail order pharmacy services, that use of the marks was not false because such an association existed at the time the marks were used.  Alternatively, as explained above, the defendants' use of the marks was within any license it might have had from DeliverMed.  Most importantly, however, there is no evidence that the use of the marks was likely to create confusion or mislead a reasonable consumer.

As for the defendants' statement on Medicate's website mentioning DeliverMed, the statement that DeliverMed illegally obtained a list of Medicate's mail order pharmacy patients is

---

represent that these are the elements:
>     1. The public recognizes the Trademarks as identifying the Plaintiff's products or services and distinguishing those products or services from other companies;
>     2. This recognition occurred before the Defendants' offered their products or services;
>     3. Defendants' [sic] used the Trademarks in a manner likely to cause confusion among ordinary buyers as to whether the products or services are Plaintiff's or Defendant's; and
>     4. Plaintiff was damaged as a result.

They cite the statute and the cases *Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.*, 47 U.S.P.Q. 2d 1341 (D.C. Cir. 1998), and *Oxford Indus., Inc. v. Hartmarx Corp.*, 15 U.S.P.Q. 2d 1648, 1655 (N.D. Ill. 1990), neither of which lists the elements of an unfair competition claim.

However, in their response to DeliverMed's post-trial brief (Doc. 270), the defendants represent that these are the elements:
>     1. the defendant made a misrepresentation in commercial advertising or promotion concerning goods, services, or commercial activities;
>     2. the misrepresentation actually deceived or tended to deceive its recipients;
>     3. the misrepresentation was likely to influence purchasing decisions;
>     4. the misrepresentation injured or was likely to injure the plaintiff; and
>     5. the misrepresentation was made in commerce.

Here, the defendants cite a treatise:  22 Causes of Action 365 (1990).
>     It is easy to understand why the Court is not anxious to exhaustively list the elements of DeliverMed's case in Count III, any incorrect or incomplete statement of which would simply provide fodder for an appeal.  Suffice it to say that the common thread presented by all parties is that a defendant must have done or said something to cause confusion to consumers about its service.

false.  DeliverMed obtained the list of patients through its work identifying and developing patients for the JV.  Nevertheless, there is no evidence this misrepresentation was likely to create confusion or mislead anyone about the mail order pharmacy services provided by Medicate or that the misrepresentation caused or was likely to cause any damage to DeliverMed.  On the contrary, mail order pharmacy customers were confused because, after Swift transferred the toll-free numbers to destinations other than Medicate, the customers did not reach Medicate when they called those numbers.  Medicate's website notice was an attempt to clarify this confusion and did not constitute unfair competition.

As for the other statements on Medicate's website notice, they are not false, are not likely to cause confusion or mislead a reasonable consumer, and did not and were not likely to cause any damage to DeliverMed.

For these reasons, the defendants are entitled to judgment on Count III.

### 3.    Counterclaim 2:  Cancellation of Registered Logo Trademark

This counterclaim is brought by defendants Medicate and Schaltenbrand under 15 U.S.C. §§ 1064 and 1119 seeking cancellation of DeliverMed's registration of the "house and pestle" logo on the principal register (Reg. No. 3,913,346).

Any person who believes he is or will be damaged by the registration can seek cancellation of the registration within five years of the registration.  *See* 15 U.S.C. § 1064(1). The Court is authorized to order the cancellation of registration if it deems appropriate.  *See* 15 U.S.C. § 1119.  Cancellation is warranted where clear and convincing evidence shows the applicant used fraud – a deliberate attempt to mislead the USPTO into registering the mark – to obtain the trademark registration.  *See Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982).

45

For the reasons explained above, despite its trademark registration on the logo, DeliverMed does not have a trademark interest in the logo for use with mail order pharmacy services. In addition, clear and convincing evidence establishes that Swift obtained DeliverMed's trademark registration on the logo by knowingly and intentionally misrepresenting that (1) DeliverMed first used the logo before it was actually created, (2) DeliverMed used the logo to provide mail order pharmacy services, and (3) it had the exclusive right to use the logo. He did this in an effort to make it appear that DeliverMed, and DeliverMed alone, used the logo in connection with mail order pharmacy services prior to the JV's first use of the logo in connection with such services. He believed registration of the logo by DeliverMed would give it an advantage in this litigation, which had commenced six days before he filed the trademark registration application. Swift deliberately and successfully misled the USPTO into registering the mark. The USPTO would not have registered the logo trademark on the principal register had it known the true facts. Swift's actions constitute fraud on the USPTO and warrants cancellation of DeliverMed's logo registration.

Accordingly, defendants Medicate and Schaltenbrand are entitled to judgment on Counterclaim 2. The Court will declare invalid DeliverMed's Certificate of Registration No. 3,913,346 for the 2-D artwork known as the "house and pestle" logo and will order the USPTO to cancel that registration.

4.     Counterclaim 3:  Cancellation of Registered "DeliverMed" Name Trademark

This counterclaim is brought by defendants Medicate and Schaltenbrand under 15 U.S.C. §§ 1064 and 1119 seeking cancellation of DeliverMed's registration of the "DeliverMed" name on the supplemental register (Reg. No. 3,570,921).

For the reasons explained above, despite its trademark registration on the "DeliverMed" name, DeliverMed does not have a trademark interest in the name for use with retail pharmacy services.  However, while there is substantial evidence that Swift obtained DeliverMed's trademark registration on the "DeliverMed" name by making misrepresentations, the evidence is not clear and convincing that those misrepresentations were knowing and intentional.  Swift misrepresented that the name was first used on February 1, 2005, in connection with pharmacy services, but it is plausible to believe that he *intended* to use the name in connection with such services in partnership with a pharmacy as of that date and that his mistake was a misinterpretation of the application question.  There is also no suggestion that Swift sought registration of the name "DeliverMed" for the purpose of gaining an advantage in this litigation as opposed to securing stronger rights to the name of a company he had started or hoped to start. There is no clear and convincing evidence of fraud.

For this reason, DeliverMed is entitled to judgment on Counterclaim 3.

4.    Attorney's Fees

In light of the intentional wrongful acts of Swift on behalf of DeliverMed with respect to the logo trademark application and DeliverMed's frivolous filing of claims based on the "Right at Home" tagline to which it clearly has no rights, the Court believes Counts II and III and Counterclaim 2 present an exceptional case for which attorney's fees should be allowed to the prevailing party under 15 U.S.C. § 1117(a).  Indeed, bad faith or groundless claims by the losing party can make a claim "exceptional" under the Lanham Act.  *See Stephen W. Boney, Inc. v. Boney Services, Inc.*, 127 F.3d 821, 827 (9th Cir. 1997).  Accordingly, the Court exercises its discretion pursuant to 15 U.S.C. § 1117(a) to award attorney's fees to defendants Medicate, Schaltenbrand and Siddle, to be paid by DeliverMed, for their defense of Counts II and III as to

47

the logo and tagline and for Medicate's and Schaltenbrand's prosecution of Counterclaim 2.

C.      State Law Claims

      1.      Count IV:  Illinois Uniform Deceptive Trade Practices Act Claim Based
            on Name, Tagline and Logo

DeliverMed brings this claim under the UDTPA, 815 ILCS 510/2, against all defendants

based on their use of the "DeliverMed" name, the "Right at Home" tagline and the "house and

pestle" logo.  Where UDTPA and Lanham Act claims arise from the same set of facts, the claims

are resolved using the same legal standards.  *See Specht v. Google Inc.*, 758 F. Supp. 2d 570, 596

(N.D. Ill. 2010);  *Morningware, Inc. v. Hearthware Home Products, Inc.*, 673 F. Supp. 2d 630,

639 (N.D. Ill. 2009).  Therefore, for the reasons the Court found the defendants are entitled to

judgment on Counts II and III, it also finds they are entitled to judgment on Count IV.

      2.      Count V:  Illinois Consumer Fraud Act Claim Based on Name, Tagline
            and Logo

DeliverMed brings this claim under the ICFA, 815 ILCS 505/1 *et seq.*, based on use of

the DeliverMed name, the "Right at Home" tagline, and the "house and pestle" logo.  However,

it concedes in its closing argument that it has not proved this claim (Doc. 262 at 43:  "After

thorough review of the record at trial, DeliverMed Holdings concedes that it has not proven the

elements of an Illinois Consumer Fraud Act violation.").  Therefore, the defendants are entitled

to judgment on Count V.


**SWIFT ACTION**

D.      Common Law Fraud

In Count VI, Swift claims Schaltenbrand committed fraud when he (1) failed to disclose

to Swift that his divorce decree prevented him from conveying an ownership interest in

Medicate, (2) used money coming in to Medicate for personal expenses and to pay costs of Schaltenbrand's other businesses and placed that money in bank accounts not belonging to Medicate.  Swift has abandoned other claimed instances of fraud by not including them in the Final Pretrial Order.

In Counterclaim 4, Medicate and Schaltenbrand claim Swift[6] committed fraud when he made statements to them in connection with his efforts to sell the mail order book of business.

All parties agree that the elements of a cause of action for common law fraud are:  (1) the defendant made a false statement of material fact, (2) the defendant knew the statement was false or made it in reckless disregard for the truth, (3) the defendant made the statement with the intent to induce the plaintiff to rely on it, (4) the plaintiff reasonably relied on the statement and (5) the plaintiff suffered damage as a result.  *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996).  Where the fraud consists of concealment rather than an affirmative misrepresentation, the plaintiff must prove the defendant concealed a material fact where he was under a duty to disclose it.  *Id.* at 593.

1.   Count VI

Schaltenbrand did not commit fraud when he failed to disclose to Swift the existence of the order in his divorce proceedings that limited his ability to encumber or transfer his interest in Medicate without notice to his ex-wife Lisa.  The order did not prevent the transfer of any property; it simply required notice to be given before the transfer could occur.  The existence of such a provision was not material to the JV relationship but simply ensured that Lisa would be aware of the form in which certain of Schaltenbrand's assets took at any particular time.

---

[6]Counterclaim 4 is also pled against DeliverMed.  However, DeliverMed has never been brought into the Swift Action.  Therefore, the Court considers Counterclaim 4 to be only against Swift.

Additionally, Schaltenbrand did not intend Swift to rely on the non-existence of such a provision when negotiating to sell the mail order book of business, and Swift, in fact, did not rely on Schaltenbrand's ability to complete a transfer without giving 30-days' notice.  Finally, Swift was not damaged by Schaltenbrand's failure to disclose the court order.  No transfer of any interest in Medicate occurred, but it was not because of any restriction on Schaltenbrand's ability to encumber or transfer his property without letting his ex-wife Lisa know.

Schaltenbrand did not commit fraud when he paid some personal expenses – for example, maintenance to his ex-wife Lisa – from Medicate's income.  Schaltenbrand testified credibly that many of the expenses Swift speculated were personal were actually for business purposes.  As for the true personal expenses, Schaltenbrand disclosed to Swift even before the JV was formed that he used Medicate's income for some of his own personal expenses, and Swift saw no problem with that.  Such expenses were not material to Swift's decision-making.  On the contrary, Swift was concerned with being able to extract payments from Medicate at will, either as cost reimbursements or distributions.  As long as he could achieve this, he was unconcerned that Schaltenbrand paid personal expenses from funds that would have otherwise been classified as JV profits.  Swift simply did not rely in any way on Schaltenbrand's using Medicate income only for business purposes.  The evidence does not show that Schaltenbrand defrauded Swift by paying personal expenses from Medicate's income.

Schaltenbrand did not commit fraud when he failed to inform Swift of the various bank accounts into which income from Medicate was deposited.  Swift knew about the bank accounts in which Schaltenbrand deposited Medicate's income because payments to him, Sickon and/or DeliverMed, all of which Swift knew about, were made from those various accounts.  More importantly, the location of Medicate's income was irrelevant to Swift so long as he was able to

50

convince Schaltenbrand to pay him or DeliverMed money at his request.  He did not rely in any way on the money being kept in any particular bank account. Furthermore, Swift has not carried his burden of proving that he suffered any damages from Schaltenbrand's use of various bank accounts to hold money coming in to Medicate.

Schaltenbrand did not commit fraud when he made internal loans between companies he owned in order to pay bills.  The preponderance of the evidence does not show any improper transfers between companies owned by Schaltenbrand.  Additionally, as with Schaltenbrand's personal expenses, Swift was unconcerned with Schaltenbrand's disposition of income to Medicate so long as he was able to extract money from Medicate to pay distributions and DeliverMed's costs at Swift's request.  Furthermore, Swift has not carried his burden of proving that he suffered any damages from Schaltenbrand's inter-company shifting of funds.

For these reasons, the defendants are entitled to judgment on Count IV.

### 2.    Counterclaim 4

Counterclaim 4 asserts that Swift defrauded Medicate and Schaltenbrand when he "made statements to them regarding his alleged efforts to sell the mail order business to interested buyers and those buyers' requests."  Final Pretrial Order at 6 (Doc. 215).  This claim does not contain sufficient particularity to assert a claim for fraud, and the Court will not graft the allegations from the defendants' closing briefs into their claim.

Nevertheless, even if the defendants believed, as they assert in their closing briefs, that no such potential buyers existed, they did not prove this by a preponderance of the evidence at trial.  The defendants also assert Swift falsely represented that if Schaltenbrand took out and personally guaranteed more loans for Medicate for use in the JV business, the value of the mail order book of business would be higher.  However, even if Swift made these false statements

intending Schaltenbrand to rely on them in incurring personal liability, Schaltenbrand's reliance

was not reasonable.  He was a long-time businessman with access to all the financial records of

Medicate and the ability to assess Medicate's true financial situation.  He was also savvy enough

to know he should consult qualified business valuation professionals before accepting without

question Swift's proposed course of action.  Instead, he took Swift's advice without the slightest

investigation and without regard for the personal consequences to himself.  He cannot now

claim, after being an ostrich for so long, that Swift fooled him.

    E.    <u>Count VII:  Breach of Contract Regarding Wages, Commissions and Distributions</u>

Swift claims the defendants owe him unpaid salary and distributions, including $1,000

per week for each week after Medicate terminated him, "back salary" of $50,333 based on his

work for the JV beginning in 2005, and distributions due to him.

In order to prevail on a breach of contract claim, a plaintiff must prove "(1) offer and

acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of

all required conditions, (5) breach, and (6) damages."  *Wigod v. Wells Fargo Bank, N.A.*, 673

F.3d 547, 560 (7th Cir. 2012) (internal quotations and citations omitted).

    1.    <u>Salary</u>

Medicate and Schaltenbrand have not breached a contract to pay Swift a salary of $1,000

per week as a Medicate employee after his employment was terminated.  The contract

established between Swift and his employer Medicate was to pay him $1,000 per week

beginning in January 2008 for as long as he was employed by Medicate.  His employment

ceased in September 2009, and the oral employment contract did not obligate Medicate to

continue to pay him after that date.  Medicate paid him the salary he was due during his period

of employment, and it owes him no more.

### 2.   Bonus

Medicate owes Swift $50,333 for his unpaid bonus compensation.  Schaltenbrand and Medicate promised to pay Swift this bonus in appreciation for his prior work for the JV and as part of the consideration for his continuing work as an employee of Medicate.  This bonus award is not "back salary."  There is no such thing as "back salary" for a period in which the individual did not work for the employer.

### 3.   Partnership Distributions

Medicate and Schaltenbrand have not breached a contract to pay Swift distributions. Swift argues he was not paid 40% of the JV's profits from 2005 to 2007 and 35.9% of the JV's profits from 2008 to the present.[7]  The evidence to support Swift's claim to damages from the failure to pay sufficient distributions until September 1, 2009 is unclear, inconsistent, unreliable and often incredible.  The preponderance of the evidence does not demonstrate the magnitude of any profits the JV had, the distributions made to Swift (or to his proxies Sickon and DeliverMed which are attributable to Swift), or the insufficiency of those distributions when compared to those promised in the JV partnership agreement.  Swift has not met his burden of proof.

The Court rejects Swift's argument that since Schaltenbrand and Siddle received excessive distributions, he should receive excessive distributions in the same proportion to bring the JV in line with partnership profit-sharing rules.  Swift is entitled to 40% or 35.9% of the JV's

---

[7]To the extent Swift seeks recovery for partnership distributions to which he had a claim prior to his September 2005 Chapter 7 bankruptcy petition, he is judicially estopped from recovery because he failed to list them on his schedule of assets or disclose them in his bankruptcy proceeding and there is no evidence the Trustee has abandoned the claim.  *See Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006) (holding that "a debtor who conceals claims in a bankruptcy proceeding is estopped from later recovering on those claims").

profits, depending on the time frame.  He has failed to prove his distributions fell short of those

percentages any time before he dissociated himself from the partnership on September 1, 2009.

The Court is unconcerned with the consequences of this ruling on compliance with other laws.

That is a matter the parties will have to sort out in another forum.

As for Swift's right to receive distributions after September 1, 2009, he has no such right

because he was dissociated from the partnership.  The JV partnership is governed by Illinois law

because all offices of the JV are located in Illinois.  *See* 805 ILCS 206/106(a).  Under the Illinois

Uniform Partnership Act, a partner is dissociated from a partnership when the partnership has

notice of the partner's express will to withdraw as a partner.  *See* 805 ILCS 206/601(1).  Swift's

attorney Kyle Berry's September 1, 2009, letter to Schaltenbrand about dissolving the

partnership and Swift's course of conduct in contravention of partnership duties provided notice

to the partnership of Swift's express will to withdraw as a partner.  Thus, as of September 1,

2009, Swift was dissociated from the JV partnership and was entitled to be bought out under 805

ILCS 206/701, but was not entitled to continue sharing in mail order business profits under any

partnership agreement.  In light of the fact that the ultimate undertaking of the partnership – sale

of the book of mail order customers – had not been achieved at the time of Swift's dissociation,

that dissociation was wrongful.  *See* 805 ILCS 206/602(b)(2)(i) ("A partner's dissociation is

wrongful only if . . . in the case of a partnership for a . . . particular undertaking, before . . . the

completion of the undertaking . . . the partner withdraws by express will.").

Even if the partnership had continued beyond September 1, 2009, the evidence to support

Swift's claim to damages from the failure to pay sufficient distributions beyond September 1,

2009, is unclear, inconsistent, unreliable and often incredible.  The preponderance of the

evidence does not demonstrate the magnitude of any profits, the distributions actually made, or the insufficiency of those distributions.  Swift has not met his burden of proof.

For these reasons, the defendants are entitled to judgment on Count VII.

F.       Count VIII:  Fair Labor Standards Act

Swift claims the defendants are liable to him under the FLSA for unpaid salary. Generally, the FLSA requires employers to pay employees engaged in commerce at least the federal minimum wage of $7.25 per hour.  *See* 29 U.S.C. § 206(a)(C).  It further requires an employer to pay employees working more than forty hours a week overtime pay at a rate of one and one-half times the regular rate for hours worked in excess of forty per week.  *See* 29 U.S.C. § 207(a)(1).  However, minimum wage and overtime pay requirements do not apply to employees working in a bona fide executive, administrative or professional capacity.  *See* 29 U.S.C. § 213(a)(1).

A person is employed in a bona fide administrative capacity if (1) he is paid at least $455 per week, (2) his primary duty is performing office or non-manual work directly related to the management or general business operations of the employer or the employer's customers, and (3) his primary duty includes exercising discretion and independent judgment with respect to matters of significance.  *See* 29 C.F.R. § 541.200(a).  A person is employed in a bona fide professional capacity if (1) he is paid at least $455 per week, (2) his primary duty is performing work that requires advanced knowledge in a field of learning gained by specialized instruction. *See* 29 C.F.R. § 541.300(a).

Swift worked for Medicate in an administrative or professional capacity.  He was paid more than $455 per week, his duties involved exercising discretion and independent judgment about significant matters, and his primary duties required advance knowledge in the fields of

business, finance and marketing.  Thus, the FLSA minimum wage and overtime pay requirements do not apply to him.  The evidence does not support liability under any other provision of the FLSA.  Accordingly, the defendants are entitled to judgment on Count VIII.

G.      Count IX:  Illinois Wage Payment and Collection Act

Swift claims the defendants are liable to him under the IWPCA for unpaid salary and distributions.  The IWPCA requires employers to pay on a monthly basis all compensation due under an employment contract to executive, administrative or professional employees.  *See* 820 ILCS 115/2 & 3.  This compensation must be paid within 21 days of the period in which the compensation was earned.  *See* 820 ILCS 115/4.

As explained above, Medicate paid all salary due to Swift under his employment agreement.  Swift is not entitled to distributions under his employment agreement; that entitlement is by virtue of the JV partnership agreement.  Thus, payment of distributions is not mandated by the IWPCA.

However, Medicate failed to timely pay Swift's bonus in the amount of $50,333 which it should have paid upon his termination on September 1, 2009.  The bonus was part of the consideration promised for Swift's employment beginning in January 2008, so it is part of his wages as defined by the IWPCA.  *See* 820 ILCS 115/2.  Swift is entitled to this amount under the IWPCA.  In addition, effective January 1, 2011, the IWPCA also provides an additional award of damages of 2% per month for each month that amount of the bonus was not paid.  *See* 820 ILCS 115/14(a).  That results in an additional award of $ 1,006.66 per month beginning in January 2011, for an additional damage award of $21,139.86 ($1,006.66 x 21 months).  Swift is also entitled to reasonable attorney's fee for this part of the lawsuit.  *See* 820 ILCS 115/14(a).  Medicate did not willfully refuse to pay this delinquent bonus or falsely deny the amount or

validity of this bonus with the intent to secure a benefit for itself or to annoy, harass, oppress, hinder delay or defraud Swift by failing to pay it.  On the contrary, Medicate's witnesses at trial admitted that amounts remain due on the promise of the $151,000 bonus and failed to pay under a good faith belief he had been overpaid in distributions, which would offset amounts owed to Swift.

For these reasons, Swift is entitled to judgment on the part of Count IX alleging the failure to pay a bonus but not on the part of Count IX alleging the failure to pay salary and distributions.

H.      Count X:  Breach of Contract Regarding Stock Transfer

Swift claims the defendants breached an agreement to convey to him an ownership interest in Medicate as part of the 2008 revised partnership agreement.  This claim has no merit in light of the fact that the parties did not agree that Swift would get an ownership interest in Medicate as a whole or in Medicate's Washington Park pharmacy operations.  The 2008 revised partnership agreement simply involved a revised split of the profits from a different pool of money coming into Medicate.  The defendants are entitled to judgment on Count X.

I.      Count XI:  Promissory Estoppel

Swift claims that under the equitable doctrine of promissory estoppel the defendants owe him compensation for the value of his alleged interest in Medicate.  He argues that he relied on the promise of an ownership interest in Medicate to reduce his share of the profits from 40% of the mail order business profits to 35.9% of the Washington Park pharmacy profits.

In order to succeed on a claim of promissory estoppel, a plaintiff must show the defendants made an unambiguous promise to him, that he relied on that promise to his detriment, and that his reliance was reasonable and foreseeable by the defendants.  *See Quake Constr., Inc.*

*v. American Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill. 1990);  *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 861 (7th Cir. 2001).

The preponderance of the evidence establishes that no defendant promised Swift an ownership interest in any part of Medicate's Washington Park pharmacy.  The revised percentage split of a different pool of funds was of approximately the same value as the split as it originally existed between the JV partners.  Schaltenbrand did not intend – and indeed did not promise – to donate to Swift the additional benefit of an ownership interest in the Washington Park pharmacy.  Swift's fantastic idea that Schaltenbrand would give him an ownership interest in the Washington Park pharmacy in exchange for nothing of value was wishful and unreasonable thinking on Swift's part.  To the extent he relied on his misconception of this part of the 2008 revised partnership agreement, that reliance was unreasonable.

For these reasons, the Court declines to award equitable relief on Count XI and will instead award judgment in favor of the defendants.

J.      Count XII:  Declaratory Relief Regarding Form 1099

To the extent Swift has not abandoned this claim by failing to include it in the Final Pretrial Order, Swift asks the Court to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, ordering Medicate to issue him correct Form 1099s for tax years 2007, 2008 and 2009.

The Court does not have jurisdiction to issue declaratory judgments with respect to federal taxes.  The Declaratory Judgment Act states, in pertinent part, "In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes* other than [actions not at issue here]. . . any court of the United States, upon the filing of an appropriate pleading, may

58

declare the rights and other legal relations of any interested party seeking such declaration. . . ."
28 U.S.C. § 2201(a) (emphasis added).

Swift's request falls within the Federal tax exception.  He asks the Court to determine essentially, whether a tax is due to the United States, the correct forms to report the taxable income and the correct amounts to be included on those forms, all of which have a direct bearing on the taxes collected by the federal government.  Judicial intervention in such matters by a district court is not appropriate and could delay the efficient collection of taxes.  Such tax matters should be resolved with the Internal Revenue Service, not by the Court.

Even if issuing the requested declaration were within the Court's power, Swift has failed to demonstrate he is entitled to the equitable relief he seeks.  He has not established by a preponderance of the evidence that the documents actually issued are incorrect, that the correct documents are, indeed, Form 1099s, or the substance of what the correct Form 1099s should be. There is simply no factual basis to order the defendants to prepare Form 1099s.

## V.     Other Motions

### A.     Plaintiffs' Motion for Reconsideration (Doc. 195)

In this motion, the plaintiffs ask the Court to reconsider its February 1, 2012, order (Doc. 175) denying prejudgment interest on Swift's breach of contract claim (Count VII).  The defendants have responded to the motion (Doc. 202).

"A court has the power to revisit prior decisions of its own . . . in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983));  Fed. R. Civ. P. 54(b) (providing a non-final order

"may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities").  The decision whether to reconsider a previous ruling in the same case is governed by the law of the case doctrine.  *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006).  The law of the case is a discretionary doctrine that creates a presumption against reopening matters already decided in the same litigation and authorizes reconsideration only for a compelling reason such as a manifest error or a change in the law that reveals the prior ruling was erroneous.  *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008);  *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007).

Here, the plaintiffs make new arguments and cite new cases in support of their position that they should have but did not advance in their original opposition to the defendants' motion to strike.  By failing to raise those arguments and support those arguments earlier they have waived them.

Even if the plaintiffs had not waived their argument, the Court would reject it.  In this case, equity does not require a prejudgment interest award on Count VII.  Swift has not prevailed on part of his claim in Count VII, so prejudgment interest is not available regardless of the Court's prior ruling.  As for the part of Count VII on which he has prevailed, the monetary damages of 2% per month awarded under Count IX, Swift's IWPCA claim based on the same conduct, is sufficient.  Equity does not require an additional interest award.

The motion for reconsideration (Doc. 195) will be denied.

B.    Plaintiffs' Motion in Limine (Doc. 206)

In this motion, the plaintiffs ask the Court to bar the defendants' use of certain exhibits at trial because that evidence will confuse the jury and prejudice the plaintiffs.  The evidentiary

decisions the Court made during the bench trial and the Court's own weighing of the admissible evidence render this motion moot.

C.   Defendants' Motion to Strike Amended Complaint (Doc. 217)

In this motion, the defendants ask the Court to strike or dismiss the prayer for declaratory judgment in Count I of the plaintiffs' Second Amended Complaint.  This motion (Doc. 217) is rendered moot by the Court's final decision in Count I in favor of the defendants.

D.   Defendants' Motion for Judgment on Partial Findings (Doc. 255)

In this motion, the defendants ask the Court to award judgment on partial findings at the end of the plaintiffs' case.  The defendants have responded to the motion (Doc. 262). This motion (Doc. 255) is rendered moot by the Court's final decision set forth above.

E.   Defendants' Motion to Strike Trial Brief (Doc. 267)

In this motion, the defendants ask the Court to strike from the plaintiffs' closing arguments certain documents that were not produced in discovery and all references to those documents.  The documents were responsive to the defendants' discovery requests but were only located after trial and attached to the plaintiffs' closing arguments without explanation for the delay in production.  The plaintiffs have responded to the motion (Doc. 274) arguing that the documents should not be stricken because they were produced after trial at the Court's express request during trial.  The plaintiffs also urge the Court not to consider whether the marketing expenses reflected in those documents were proper, an issue which the plaintiffs claim is not pled in this case.  The defendants have replied to the plaintiffs' response (Doc. 278).

The plaintiffs have attempted to respond to the defendants' reply brief (Doc. 280), and the defendants have attempted to respond to that brief (Doc. 281).  However, Local Rule 7.1(g) states that "[u]nder no circumstances will sur-reply briefs be accepted."  For this reason, the

Court will strike those filings (Docs. 281 & 282).

The Court has reviewed the materials submitted by the plaintiffs that were not introduced at trial and is not satisfied that they are admissible as evidence.  They lack foundation and have not been properly authenticated or explained by credible witness testimony.  Thus, the Court did not consider them in making its rulings in this case.  The motion to strike (Doc. 267) is therefore moot.  The Court declines to grant the defendants' request for sanctions.

## VI.    Conclusion

For the foregoing reasons, the Court:

- **DENIES** the plaintiffs' Motion for Reconsideration (Doc. 195);

- **DENIES as moot**:
  - the plaintiffs' Motion in Limine (Doc. 206);
  - the defendants' Motion to Strike Amended Complaint (Doc. 217);
  - the defendants' Motion for Judgment on Partial Findings (Doc. 255);
  - the defendants' Motion to Strike Trial Brief (Doc. 267);

- **DIRECTS** the Clerk of Court to enter judgment as follows:

### DeliverMed Action
#### (No. 10-cv-684-JPG-DGW)

- in favor of defendants Schaltenbrand, Siddle and Medicate and against plaintiffs DeliverMed, Deeter Associates and Deeter on Count I for copyright infringement;

- in favor of defendants Schaltenbrand, Siddle and Medicate and against plaintiff DeliverMed on:
  - Count II for trademark/service mark infringement;
  - Count III for unfair competition;
  - Count IV under the UDPTA;
  - Count V under the ICFA;

- in favor of defendants/counterclaimants Medicate and Schaltenbrand and against plaintiff/counter-defendant DeliverMed on:
  - Counterclaim 1 for a declaration of copyright invalidity;
  - Counterclaim 2 for cancellation of the "house and pestle" logo trademark;

62

- declaring that DeliverMed's Certificate of Copyright Registration VA-1-766-676 for the 2-D artwork known as the "house and pestle" logo (VA 1-766-676) is invalid;

- declaring that DeliverMed's Certificate of Registration No. 3,913,346 on the "house and pestle" logo is invalid and ordering the USPTO to cancel that registration;

- in favor of plaintiff/counter-defendant DeliverMed and against defendants/counterclaimants Medicate and Schaltenbrand on Counterclaim 3 for cancellation of "DeliverMed" name trademark;

**Swift Action**
(No. 10-cv-685-JPG-DGW)

- in favor of defendants Schaltenbrand, Siddle and Medicate and against plaintiff Swift on:
  - Count VI for common law fraud;
  - Count VII for breach of contract regarding salary, commissions and distributions;
  - Count VIII under the FLSA;
  - Count IX under the IWPCA regarding salary, commissions and distributions;
  - Count X for breach of contract regarding a stock transfer;
  - Count XI for promissory estoppel;

- in favor of plaintiff Swift and against defendant Medicate on:
  - Count VII for breach of contract regarding a bonus in the amount of $50,333.00;
  - Count IX under the IWPCA regarding a bonus in the amount of $50,333.00, plus an additional damages award of $21,139.86;
  for a total judgment in the amount of $71,472.86 plus reasonable attorney's fees.  Swift shall not be entitled to two separate bonus awards;

- dismissing Count XII for lack of jurisdiction;

- awarding defendants Schaltenbrand, Siddle and Medicate reasonable attorney's fees for their defense of Counts II and III regarding the logo and tagline and for their prosecution of Counterclaims 1 and 2;

- **ORDERS** that the appropriate parties shall submit a petition for attorney's fees for Counts II, III and IX and Counterclaims 1 and 2 within 14 days after entry of this order. The petition shall include a discussion of the factors the Court should consider when deciding the amount of fees to be awarded under the foregoing counts and shall not

exceed fifteen pages.  The opposing party shall have 7 days to file a response brief, which shall not exceed fifteen pages;

- **DIRECTS** the Clerk of Court, pursuant to 17 U.S.C. § 508(b), to send an AO-121 along with a certified copy of this order, the judgment and a list of the parties and counsel in this case to:

Register of Copyrights
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, DC  20559-6000

- **DIRECTS** the Clerk of Court, pursuant to 15 U.S.C. § 1119, to send an AO-120 along with a certified copy of this order, the judgment and a list of the parties and counsel in this case to:

Mail Stop 8
Director of the United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA  22313-1450

**IT IS SO ORDERED.**
**DATED:  October 15, 2012**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

64